**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GREGG JOSEPH LUCHESE,** | : | **Civil No. 3:23-CV-00953** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

## I.    Introduction

At the heart of this case lies a common theme, where an ALJ's finding that a claimant is not entirely disabled is at odds with a claimant's reports of debilitating, disabling pain. Adding to the difficulty in the instant case, the examining medical records are relatively sparse, and the record after the alleged disability onset date consists mostly of telehealth visits and assessments created specifically for disability adjudication. For the plaintiff's part, he alleges this is partially due to his lack of health insurance, which made it expensive for him to seek medical treatment for his conditions, as well as the COVID-19 pandemic, which required him to limit in-person medical visits. He argues that, as a 40-year veteran of the workforce, he has demonstrated his commitment to his field but is unable to return to his profession as

a construction superintendent, nor any other regular job, due to his chronic back and neck pain. He alleges he became disabled on March 6, 2021, due to cervical and lumbar disc disorder and in fact his medical records, including recent MRIs, show a history of worsening degenerative disc disease and herniated discs in his neck, but his physical examinations also consistently showed normal strength and reflexes and a normal gait, and he reported treating his pain with Advil.

On these facts, the ALJ who presided over Luchese's disability hearing concluded that he had not met the stringent standard required to establish disability and denied this claim. (Tr. 15-27). While Luchese challenges the ALJ's decision, we are reminded of the familiar proposition that we exercise a limited scope of substantive review when considering Social Security appeals. As the Supreme Court has noted:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

> Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v.
> Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999)
> (comparing the substantial-evidence standard to the deferential clearly-
> erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

While this is a close case, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings that the plaintiff was not disabled. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.    **Statement of Facts and of the Case**

The administrative record of Gregg Luchese's disability application reveals the following essential facts: Luchese applied for disability insurance benefits on April 9, 2021, alleging an onset of disability beginning on March 6, 2021. (Tr. 18). Luchese was born in July of 1965 and was approximately 55 years old at the time of the alleged onset of his disability. (Tr. 186). He has a high school education and prior employment as a construction supervisor. (Tr. 212).

Luchese's presenting medical impairments consisted of progressively worsening lower back pain due to degenerative disc disease and neck pain due to herniated discs following an occupational injury. (Tr. 44). Luchese cautions that his

3

medical history should be viewed with the knowledge that he does not have health insurance and cannot afford it on his own, and that he had accrued $20,000 in medical debt at the time of his hearing. (Doc. 9, at 5). Nonetheless, the medical record before the ALJ, and this court, is quite spare.

Luchese testified that he is unable to work full-time due to pain and discomfort in his neck and back. (Tr. 43). His back pain derives from degenerative disc disease, which is not the result of any acute injury but rather a chronic issue that continued to get progressively worse over eight to ten years. (Tr. 44). His neck pain was attributable to a work injury in which he hit his head on a pipe, compressing his neck and causing three herniated discs. (Tr. 45). According to Luchese, he did not realize the severity of his neck injury until several months later when he began having pain in his right arm, shooting down his hand and right leg and through his buttocks, at which time he was examined by a doctor, and it was discovered he had herniated disks in his neck. (Tr. 44).

Since Luchese has described his symptoms as chronic and worsening over time, his treatment records prior to his alleged onset date of March 6, 2021, are also relevant and were considered in his medical assessments and by the ALJ. As to his lower back pain, the clinical records indicate that Luchese sought treatment at the emergency room as far back as August 2017 complaining of chronic back pain and

4

spasms (Tr. 320), received approximately 5-6 steroidal injections to his lower back and upper neck between 2017 and 2022, (Tr. 383, 374, 357, 405), participated in physical therapy, (Tr. 476), and treated his pain primarily with Advil. (Tr. 338, 377, 390, 425). However, his examinations regularly showed normal strength, reflexes, and gait, (Tr. 339, 392-93, 477), but also revealed periods of absence from work due to his conditions. (Tr. 340, 369).

At an appointment at Englewood Spine Associates in January 2020 he explained that his symptoms started around 2015 and became gradually worse over time. (Tr. 338) At that time he was still working full-time, but described constant sharp pain made worse with sitting, bending, twisting, running walking, lifting, and reaching overhead and that he experiences stiffness. (Id.) At that time he was taking Advil and tramadol. (Id.) Upon examination, his range of motion was normal for lumbar flexion, extension, axial rotation, and left and right lateral bend but there was mechanical pain with range of motion, particularly with extension. (Tr. 339). He exhibited normal strength, sensation, and reflexes. (Id.) The records indicate he had been treating his problem conservatively for years but that he could be a candidate for arthroplasty. (Id.) They recommended a more recent MRI study before proceeding with surgical intervention and instructed him to return if pain or

symptoms arose. (Id.) He was out of work from January 14th, 2020 to February 14th, 2020. (Tr. 340).

Mr. Luchese was also seen several times by Dr. Jennifer Soo Hoo at Comprehensive Spine Care. In February 2020, he presented complaining of intense lower back pain. (Tr. 377). He stated he had been dealing with intermittent low back pain since around 2015 but had recently twisted his back getting something out of his truck which left him unable to get out of bed for two weeks. (Id.) He noted that he had done physical therapy multiple times with minimal benefit and found Advil to be most helpful for pain. (Id.) An MRI showed multi-level degenerative disease and disc bulges, (Tr. 379), and upon examination Dr. Soo Hoo noted he was unable to stand up straight and had tenderness to palpation along his right lumbar paraspinal muscles and buttocks. (Tr. 378). She was unable to test his range of motion, strength, or reflexes due to severe pain. (Id.)

He received three cervical epidural injections in September of 2019, March of 2020, and November of 2020. (Tr. 383, 374, 357). At his November 2020 appointment with Dr. Soo Hoo, he noted that his March epidural injection gave him about a month of relief before the pain came right back. (Tr. 368). He reported pain in his back and radiating into his buttock and anterior thigh that was aggravated by sitting and driving and improved with rest. (Id.) Dr. Soo Hoo noted that his job

seemed to flare the pain and he was getting frustrated with it. (Id.) At the time he reported taking four Advil per day and found physical therapy not helpful at all. (Id.) Dr. Soo Hoo noted that he was "wondering what else can be done for his pain as he needs to get back to work to make money." (Id.) He was written a work excuse letter stating he needed to be off work for two additional weeks for further medical care. (Tr. 369).

Mr. Luchese saw Dr. Soo Hoo for a telemedicine follow-up in December 2020 and stated he was hoping the November epidural shot would improve his pain even more but it didn't. (Tr. 345). He explained that he did feel much better but still had pain with certain movements such as driving, sitting too long, and exertion. (Id.) He told Dr. Soo Hoo that he had discussed getting a younger guy to work with him to do most of the heavy lifting and getting a different vehicle with a more supportive seat. (Id.) He explained that he was taking Advil every day for his pain, and Dr. Soo Hoo recommended he take a break, advising that "it is not good to take every day for months and months." (Tr. 425).

As to his neck pain, according to the clinical records, at a new patient evaluation appointment in August 2019, Luchese reported he had experienced neck pain since bumping his head on a pipe while walking, crushing his neck, four years prior to the appointment. (Tr. 390). He reported constant 1/10 pain increasing to 8/10

pain worsening with neck rotation or looking up and down and improving with massage and Advil. (Id.) It was discovered that his pain was likely due to bulging discs at C5-6 and C6-7. He reported having epidural injections for two years but had stopped two years prior. (Tr. 390). He reported that his pain had worsened two weeks prior when he jumped from four feet and landed on his feet, causing pain in the night numbness, and tingling of his hands. (Id.) Examination notes showed no headaches, weakness, or numbness, normal gait and reflexes, and full ROM except slightly limited and painful with flexion and lateral rotation and side bending to the right. (Tr. 392-93). He was referred for physical therapy and an epidural and prescribed gabapentin. (Tr. 394).

Mr. Luchese then presented to Dr. Soo Hoo on March 8, 2021, for a telemedicine visit, complaining of acute neck pain attributed to his work accident where he hit his head on a pipe and chronic lower back pain. (Tr. 343). At the time of that visit, the pain had settled down after two days of rest and NSAIDs, but he still had pain and numbness, despite getting back some range of motion and denying any weakness. (Id.) Luchese indicated to Dr. Soo Hoo that he had "retired" the week before due to his ongoing pain. (Id.) Dr. Soo Hoo recommended he continue Advil as needed for pain but did not recommend any additional therapies or injections at that time. (Tr. 423)

In April 2022 saw Dr. Barry Kurtzer at Wayne Memorial Hospital complaining of chronic neck pain. (Tr. 396). An MRI of the cervical spine showed multilevel cervical spine degenerative disc disease, including a C6-7 right paracentral disc protrusion causing moderate canal stenosis, a C5-6 degenerative disc disease with moderate central stenosis and right C6 nerve root encroachment and a C4-5 degenerative disc disease with mild central canal and right C5 nerve root encroachment. (Tr. 402-03). An MRI of the lumbar spine showed multilevel lumbar spine degenerative disc disease, including moderate L4-5 central canal stenosis and mild L2-3 and L3-4 central canal stenosis. (Tr. 400-01).

Luchese's most recent clinical evaluation was upon referral to Dr. Stanley Pugsley at Greentown Medical Associates on August 3rd, 2022. Luchese saw Dr. Pugsley via video and no in-person examination was conducted. (Tr. 476). Luchese reported sharp neck pain that was activity and movement driven, and numbness and tingling in his arm. (Id.) He reported that numerous medications and therapy failed and had epidurals which would provide a month or two of relief. (Id.) The examination revealed limited neck range of motion and that he was very cautious with any movements that jarred his neck. (Tr. 477). No obvious weakness or atrophy was reported in his upper extremities and his gait was not myelopathic. (Id.) Dr. Pugsley's assessment based on the examination and review of the MRIs was cervical

spondylotic pain with cervical spondylotic radiculopathy on the right. (Id.) Dr. Pugsley explained that surgery would potentially benefit his arm symptoms but would provide much more variable results for his neck pain, which is harder to treat with surgical intervention, and warned that he could lose some range of motion. (Id.) Luchese said he wanted to think about it. (Id.)

Based upon this sparse clinical history, especially during the time of the alleged onset date of March 6, 2021, five medical sources opined regarding the disabling effect of his degenerative disc disease and herniated discs. Two state agency physicians reviewed the evidence submitted with Luchese's disability application and completed evaluations prior to his hearing. On May 24th, 2021, Dr. Toros Shahinian opined that Luchese's impairments were not severe, as his conditions were causing only a slight impact on work related function. (Tr. 61-62). Dr. Mohamed Abbassi also found Luchese's symptoms to be not severe, noting that, at his March 2021 appointment with Dr. Soo Hoo, his pain had settled down, he had gotten some of his ROM back in his neck, and he reported epidural injections were helping, and that he was trying to return to work in a more modified capacity. (Tr. 67-68).

Luchese's treating physician, Dr. Soo Hoo, completed a physical capacity evaluation on June 9th, 2022. Her evaluation indicated that, on most days, Luchese

could stand/walk thirty to forty-five minutes at a time, without necessitating a cane, but would need to rest for at least fifteen minutes after. (Tr. 453). She further opined that Luchese could stand/walk for four to six hours total in an eight-hour workday, could sit more than forty-five minutes at a time, but would need to stand and move about for more than fifteen minutes after, and could sit for a total of two to four hours in an eight-hour workday. (Id.) Dr. Soo Hoo's evaluation indicated Luchese could lift eleven to twenty pounds, could frequently reach, grasp, and handle with both hands/arms, and occasionally feel with both arms. (Tr. 454). She opined that Luchese would occasionally require more frequent breaks than allotted by employers, would have approximately four or more bad days per month that would prevent him from completing an eight-hour work shift, and would occasionally have difficulty maintaining concentration, pace, and task persistence during an eight-hour workday. (Id.)

On June 30th, 2022, treating physician Dr. Yitzchok Kurtzer also completed a form simply stating that, based on his physical examination, review of the medical records, and clinical history, Luchese is permanently disabled due to lumbar discogenic pain syndrome and cervical and lumbar radiculopathy. (Tr. 462). No further analysis of Luchese's symptoms or abilities was provided by Dr. Kurtzer.

On August 17th, 2022, state agency medical expert Dr. William Cirksena reviewed the medical evidence of record and medical interrogatories and provided a report which indicated Luchese could lift up to ten pounds continuously and could occasionally lift up to fifty pounds, but never more than fifty pounds. (Tr. 479). He opined that Luchese could continuously carry up to ten pounds, frequently carry up to twenty pounds, and occasionally carry up to fifty pounds, but could never carry more than fifty pounds. (Id.) Dr. Cirksena further opined that Luchese could sit for six hours at one time and six hours total in an eight-hour workday, could stand for three hours at a time and six hours total in an eight-hour work day, and could walk for four hours total in an eight-hour work day. (Tr. 481). He indicated that Luchese did not need a cane to ambulate, (Id.), and could continuously reach, handle, feel, push, and pull with both hands. (Tr. 482). In Dr. Cirksena's opinion, Luchese could frequently operate foot controls and climb stairs and ramps, occasionally climb ladders and scaffolds, stoop, knee, crouch, and crawl, and could continuously balance. (Tr. 482-83). He reported Luchese having virtually no environmental limitations, except a slight limitation in his ability to operate a motor vehicle. (Tr. 484).

Dr. Cirksena noted that the record did not contain evidence of nerve conduction studies to verify nerve root compression, but that when neurologic exams

were done, they showed normal range of motion and strength in all extremities, negative straight leg raising test, and normal gait and station. (Tr. 486) He also noted that it might be helpful to have a current CE to see if examination or neuro-diagnostic tests establish new findings consistent with recent MRIs regarding range of motion, strength, and reflexes. (Id.) Based on his assessment of the medical record, Dr. Cirksena opined that Luchese's impairments did not meet or equal any impairment described in the listing of impairments. Specifically, Dr. Cirksena explained:

> While the claimant meets Listing 1.15A1 in that he has degenerative disc disease with encroachment of the right C5 nerve root with radicular pain (5F, p.2), there is no evidence in the record that he also meets the required B criteria of Listing 1.15, in the absence of notation of these neurological signs during physical examination or on a diagnostic test resulting in muscle weakness or sensory changes as described in the Listing. In fact, muscle strength has been noted to be 5/5, deep tendon reflexes normal, and straight leg raising negative (2F, p. 6). In addition, he does not meet the required D criteria 1-3 in that he does not require the use of a can or other assistive device (6F, p.2) or have the inability to use one or both upper extremities as described in Listing 1.15D2-3. Also, while MRI demonstrates mild to moderate central canal stenosis (5F, p. 2), the Listing 1.16A-D is not met in the absence of evidence of compromise of the cauda equina or evidence of a medical need for a walker or assistive device or the inability to use one upper extremity to initiate and complete work-related activities.

(Tr. 487).

A telephonic disability hearing was conducted on June 30, 2022, at which Luchese and a vocational expert testified. (Tr. 33-59). At the hearing, Luchese testified about his symptoms, stating that he cannot lift anything more than a milk

13

jug, uses a cane some days when he is having acute back pain, and on a good day can walk fifty to one hundred yards at a slow pace. (Tr. 46-47). He went on to state that he tries not to do any chores that involve any kind of lifting or bending and his hobbies include watching TV, playing cards, and sitting on the porch. (Tr. 48). He indicated that his symptoms can be limited to a dull throbbing ache, as opposed to excruciating pain, by limiting his activity. (Id.) He testified that he could stand for no more than fifteen minutes at a time, can ride in a car for no more than half an hour before suffering pain. (Id.) He sits in a custom chair in his home to limit his back pain. (Id.) According to Luchese, his back and neck pain affects his ability to sleep; he wakes up eight to twelve times per night and suffers from muscular fatigue during the day, especially his right arm due to pins and needs and tingling in his right hand. (Tr. 50-51). He noted that steroid injections helped for a few weeks but ultimately made the pain worse and the only medication that seemed to help without adverse side effects is Advil. (Tr. 46, 52). As far as his ability to work, Luchese testified that he wakes up several days each week unable to get out of bed due to pain and there is no way he could get up every day to go to any job. (Tr. 53).

Following the hearing, the ALJ issued a decision denying Luchese's application for benefits. (Tr. 15-27). In that decision, the ALJ first concluded that Luchese met the insured requirements of the Act through December 31, 2026, and

had not engaged in substantial gainful activity since March 6, 2021.[1] (Tr. 20).  At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Luchese had the following severe impairments: spinal disorder including cervical and lumbar disc disease disorder. (Tr. 21) At Step 3, the ALJ determined that none of these conditions met any of the Commissioner's listing criteria, explaining:

> Specifically in terms of Listings 1.15 and 1.16, the record does not contain a documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands; or an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements. Physical examination findings indicate the claimant had a normal gait and station and ambulated without assistance. The claimant was found to have full muscle strength, intact sensation and normal reflexes (Exhibit 2F, Pg. 8). Current treatment records from 2022 note no obvious weakness or atrophy in the upper extremities and non-myelopathic gait (Exhibit 11F). In addition, Dr. Cirksena, a medical expert, opined the claimant did not require an assistive device for ambulation, had no limitation in use of the upper extremities or hands and did not meet a medical Listing (Exhibit 12F). As such, the record does not support the specific requirements to show that the claimant meets the Listings.

---

[1] The ALJ clarified that earnings from the second and third quarters of 2021 were attributable to the six months of severance pay the claimant testified he received. (Tr. 20).

(Id.)

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered Luchese's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant is limited to lifting up to 10lbs continuously, 50lbs occasionally and carrying up to 10lbs continuously, 20lbs frequently and 50lbs occasionally. The claimant could perform standing of six hours, walking of four hours and sitting for six hours in an eight-hour workday. The claimant may continuously use upper extremities to reach, including overhead, handle, finger, feel and push/pull bilaterally. The claimant may frequently operate foot controls. The claimant is limited to occupations that require no more than occasional postural maneuvers, such as stooping, kneeling, crawling, crouching and climbing ladders ropes and scaffolds. The claimant may frequently climb ramps and stairs, continuously balance and may frequently operate a motor vehicle.

(Id.)

Specifically, in making the RFC determination, the ALJ considered the medical evidence and Luchese's testimony regarding his impairments. The ALJ first engaged in a two-step process to evaluate Luchese's alleged symptoms. He found that, although the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms were

16

not entirely consistent with the medical evidence and other evidence in the record.

The ALJ specifically considered the treatment records both prior to and after the

alleged onset date. As to the treatment records prior to the alleged onset date, the

ALJ noted:

> The record shows a history of treatment for neck and back pain prior to
> the alleged onset date, including with anti-inflammatory and pain
> medication, referral for physical therapy and cervical and lumbar
> epidural steroid and pain medication injections (Exhibits 1F and 2F, Pg.
> 7 and 3F, Pgs. 7, 17, 34, 38, 43 and 54 and 5F-Duplicative records). An
> MRI of the lumbar spine from February 14, 2020 found multi-level
> degenerative disease, including disc bulges (Exhibit 3F, Pgs. 41-42).
> However, the record shows the claimant remained performing
> substantial gainful activity during this time. In addition, physical
> examination findings from this time indicate the claimant had a normal
> gait and station and ambulated without assistance. The claimant was
> found to have negative straight leg-raise testing, normal range of
> motion for lumbar flexion, extension, axial rotation and left and right
> lateral bend but with pain, full muscle strength, intact sensation and
> normal reflexes (Exhibit 2F, Pg. 8).

(Tr. 22-23). As to his treatment records beginning at the time of the alleged onset

date, the ALJ acknowledged that the diagnostic test results showed chronic changes

and supported some limitations, but that these results must be considered in

combination with Luchese's treatment history, the clinical findings on examinations

and the record as a whole. (Tr. 23). The ALJ explained:

> Treatment records from the time of the alleged onset date, March 6,
> 2021, show the claimant reporting neck pain and a little numbness in
> the right thumb, index and middle fingers. This visit was not conducted
> in person and no physical examination findings were able to be

17

provided. These records show that some of the acute neck pain had settled down and the claimant was not prescribed any treatment other than to continue Advil as needed for pain (Exhibits 3F, Pg. 3 and 5F, Pg. 12). Of note, the claimant testified at the hearing that he continues to use Advil for symptom control and it works more effectively than the prior prescription medications.

The record shows the claimant resumed treatment for his neck and back pain on April 11, 2022 with marked tenderness and decreased range of motion noted (Exhibit 7F). Thereafter, an MRI of the cervical spine from April 18, 2022 showed multilevel cervical spine degenerative disc disease, including a C6-7 right paracentral disc protrusion causing moderate canal stenosis, a C5-6 degenerative disc disease with moderate central stenosis and right C6 nerve root encroachment and a C4-5 degenerative disc disease with mild central canal and right C5 nerve root encroachment (Exhibits 4F, Pgs. 1-2, 5F and 8F). An MRI of the lumbar spine from April 18, 2022 showed multilevel lumbar spine degenerative disc disease, including moderate L4-5 central canal stenosis and mild L2-3 and L3-4 central canal stenosis (Exhibit 4F, Pgs. 3-4, 5F and 8F). While these diagnostic test results show chronic changes and support some limitations, they must be considered in combination with the claimant's treatment history, the clinical findings on examinations and the record as a whole.

The record shows the claimant next had treatment with a tele-video appointment on August 3, 2022 and these records indicate the claimant was being evaluated for neck pain and right arm numbness/tingling. These records indicate that diagnostic imaging of the neck was reviewed. Clinical findings are noted as limited neck range of motion and being cautious with any movements that would jar the neck but no obvious weakness or atrophy in the upper extremities. In addition, the claimant's gait was noted as non-myelopathic. These records indicate that the claimant was advised that a surgery would potentially provide benefit to his arm symptoms although there would be much more varied results regarding neck pain (Exhibit 11F). The undersigned notes this assessment was made without the conduction of an EMG study to assess the existence and extent of any radiculopathy.

(Id.) Overall, with regard to the clinical treatment records, the ALJ explained:

> In sum, the undersigned considered the diagnostic abnormalities, clinical deficits and references to pain with range of motion by reducing the claimant to a range of work within the parameters of the light exertional level and providing postural limitations. However, the many clinical findings indicating no abnormality of gait or reduced strength, reflexes or sensation would not support a further reduction in limitations. In addition, the undersigned considered effects of cervical and lumbar radiculopathy and subjective reports of numbness in the hands by placing specific limitations to the use of the bilateral lower extremities and the use of the bilateral upper extremities, including to handling, fingering and feeling. However, the lack of EMG testing and significant clinical findings on examination would not support further limitations in these areas. The undersigned also provided a limitation to use of a motor vehicle based on the claimant's lumbar impairment, as well as for using the hands and upper extremities to hold the wheel, and in recognition of the claimant's subjective reports of problems driving. However, the objective evidence as a whole and the level of treatment and activity level of the claimant discussed below does not support greater limitations than provided above.

(Tr. 24).

In fashioning the RFC, the ALJ also considered the statements and activities of Luchese, referencing both his hearing testimony and Function Report, (Tr. 227-234), as well as third-party statements completed by Luchese's wife, Cecilia Luchese, and his brother, Marc Luchese. As to the claimant's statements and activities, the ALJ emphasized that Luchese testified he primarily takes over-the-counter anti-inflammatory medication, which works better than his prior medications in reducing symptoms. (Tr. 24). With regard to his activities of daily

19

living, the ALJ acknowledged that Luchese has some degree of limitation but highlighted that he reported being able to do some chores on his good days, including laundry, vacuuming, loading/unloading the dishwasher, taking out the trash and other light chores. (Id.) The ALJ also noted that Luchese reported he is able to walk outside and engage in hobbies such as playing cards with his wife, reading, crossword puzzles, and movies and that he manages his finances and pays bills. (Id.) The ALJ also noted that Luchese reported driving for short distances and going to the supermarket. (Id.)

The ALJ partially accepted statements completed by Luchese's wife and brother which reported that the claimant is in constant pain and largely mirrored the statements by Luchese about his limited physical abilities. (Tr. 25). The ALJ noted that the statements were supported to an extent because Luchese's wife and brother were in "the unique position to observe the claimant on a regular basis," but the ALJ also acknowledged that, due to their familial relationship, their statements could not be considered the same as statements from a disinterested third party. (Id.)

Finally, in fashioning the RFC, the ALJ considered the medical opinions and prior administrative medical findings. The ALJ found the assessment of medical expert Dr. Cirksena persuasive but found the opinion of Dr. Soo Hoo to be unpersuasive and the opinions of Dr. Shahinian, and Dr. Abbassi to be partially

persuasive. The ALJ dismissed the statement from Dr. Kurtzer indicating Luchese was "permanently disabled" as a statement on issues reserved to the Commissioner and not a medical opinion pursuant to the current regulations. (Tr. 25).

The ALJ gave considerable weight to the assessment of medical expert Dr. Cirksena. The ALJ explained that he found Dr. Cirksena's opinion persuasive because it is explained in terms of diagnostic test results and objective clinical findings, it is consistent with subsequent treatment records noting limiting range of motion and cautious movements but showing no obvious weakness or atrophy in the upper extremities and non-myelopathic gait, and because Dr. Cirksena is an impartial medical expert who is familiar with the social security listings and regulations and had the opportunity to review all the medical evidence presented at the hearing level. (Tr. 24).

As to the medical opinion of treating physician Dr. Soo Hoo, the ALJ found this opinion unpersuasive because it was not well explained in terms of objective evidence and the extreme nature of the limitations in Dr. Soo Hoo's opinion were not consistent with subsequent clinical findings showing no obvious weakness or atrophy in the upper extremities and non-myelopathic gait, despite noting limited neck range of motion and the claimant being cautious with any movements that would jar the neck. (Tr. 26). The ALJ also noted that the extreme nature of the

21

limitations in Dr. Soo Hoo's opinion were not consistent with the treatment level, "which while acknowledging a lack of health insurance, has not included a need for emergency treatment or occasional office visits," nor with Luchese's statements that he is treating his symptoms with Advil. (Id.)

Finally, he found the medical opinions of Dr. Shahinian and Dr. Abbassi partially persuasive to the extent that they were supported by an explanation of the available medical evidence at the time of the opinions and consistent with a conservative level of treatment as of the alleged onset date, but not completely persuasive since they did not consider any subsequent diagnostic testing of the cervical and lumbar spine and additional clinical findings. (Tr. 26). He also found their opinions unpersuasive to the extent that they were not consistent with the assessment of Dr. Cirksena's opinion, who had the opportunity to review an expanded evidentiary record. (Id.)

Having arrived at this RFC assessment, the ALJ found that Luchese could both perform his past relevant work and could engage on other work which existed in the regional and national economy. (Id.) Based upon these findings the ALJ determined that Luchese did not meet the stringent standard for disability set by the Act and denied this claim. (Tr. 27).

This appeal followed. (Doc. 1). On appeal, Luchese argues that the ALJ erred in failing to adequately consider his testimony as to the total limiting effects of his symptoms and by adopting Dr. Cirksena's opinion over that of his treating physician. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

23

1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial

review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.   **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20

C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R.

§§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the

proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment

of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence

standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C.   Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence

The plaintiff filed this disability application in 2021, after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March 0f 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

31

The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u> ("<u>Revisions to Rules</u>"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." <u>Id</u>. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more

persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions " the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

33

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### D. Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is also illustrated by those cases which consider analysis of a claimant's reported pain. When evaluating lay testimony regarding a claimant's reported degree of pain and disability, we are reminded that:

[T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir.1994) (citing Stewart v. Sec'y of Health, Education and Welfare, 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

McKean v. Colvin, 150 F.Supp.3d 406, 415–16 (M.D. Pa. 2015) (footnotes omitted).

Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective

reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled"). It is well settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. § 404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence, or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to medical signs and laboratory findings, diagnoses, and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a

claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015); George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24, 2014).

### E.  The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large

or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Luchese retained the residual functional capacity to perform light work. Therefore, we will affirm this decision.

In reaching this conclusion, we note that the ALJ's decision comported with the opinion of the medical expert whose judgment the ALJ determined possessed the greatest persuasive power, Dr. Cirksena. Substantial evidence supported this assessment of the medical opinion evidence. Dr. Cirksena's opinion is supported and explained in terms of diagnostic test results and objective clinical findings. Further, Dr. Cirksena had access to the most complete body of clinical and medical opinion evidence at the time of his August 2022 assessment, compared to Drs. Shahinian, Abbassi, and Soo Hoo, whose opinions did not consider subsequent diagnostic testing of the cervical and lumbar spine and additional clinical findings.

The plaintiff argues that the ALJ failed to address an insufficiency in the record, noting that Dr. Cirksena's opinion mentioned that it might be helpful to have a current physical examination to test Luchese's range of motion, strength, and reflexes. However, Dr. Cirksena did not identify this lack of recent physical examination as an insufficiency in the clinical evidence that prevented him from

making his assessment. And, in fact, it is clear that the ALJ considered "the many clinical findings indicating no abnormality of gait or reduced strength, reflexes or sensation," in determining that Dr. Cirksena's opinion was the most persuasive. (Tr. 24). Further, despite no in-person examination having been done, the clinical findings from Luchese's August 2022 appointment showed no obvious weakness or atrophy in the upper extremities and non-myelopathic gait. Most importantly, the ALJ's decision shows that the ALJ carefully assessed and evaluated each of the medical opinions and made detailed findings regarding the weight to be afforded to various aspects of those opinions.

As to Luchese's argument that the ALJ failed to adequately consider his testimony as to the disabling effects of his symptoms, we find the ALJ properly considered the seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms, including his activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional

limitations and restrictions. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ

specifically stated:

> The claimant testified he primarily takes over-the-counter anti-inflammatory medication since he no longer has health insurance and this works better than his prior medications in reducing his symptoms. The claimant testified he does not really perform household chores. However, he reported that on days when he is feeling good that he is able to perform laundry, vacuuming, loading/unloading the dishwasher and other light chores. The claimant reported taking the trash out to the side of the house and putting it in the garbage can. The claimant reported he is able to walk outside when he feels up to it. The claimant testified he plays cards with his wife and reported reading, doing crossword puzzles, going through mail and paying bills. The claimant reported he is generally able to get dressed except for bad days when his wife helps him put on his shoes and socks. The claimant reported he does perform some driving for short distances, goes to a local supermarket for small things that his wife needs, manages his finances and is able to watch movies (Exhibit 4E and Hearing Testimony). While the undersigned did not place undue weight on any single activity, and while the undersigned acknowledges that the claimant has some degree of limitation in performing activities of daily living, taken together with the above medical evidence of record, these activities suggest that the claimant can perform work within the above parameters. As such, the claimant's testimony is partially accepted because while it was candid and supports some limitations, it is not entirely consistent with the level of limitation alleged by the claimant or with the objective medical evidence as discussed above.

(Tr. 24-25). Thus, while the Social Security Administration has recognized that

individuals may experience their symptoms differently, and may be limited by their

symptoms to a greater or lesser extent than other individuals with the same medical

impairments, signs, and laboratory findings, SSR 16–3p, the ALJ is bound to weigh

the claimant's statements about his symptoms against the objective medical evidence. We find that the ALJ did so here.

While Luchese argues on appeal that the ALJ erred in this assessment, at bottom this argument invites us to re-weigh the evidence. This we may not do. See, e.g., Rutherford, 399 F.3d at 552 (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder'")). In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting de novo might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   <u>**Conclusion**</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.


<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: December 15, 2023